IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| NAEEMA JAMES, | ) | |
| | ) | CIVIL ACTION FILE |
| Plaintiffs, | ) | NO.  1:12-CV-04023-RLV |
| | ) | |
| vs. | ) | |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE TO WAL-MART'S MOTION FOR
PROTECTIVE ORDER AND
PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

COMES NOW,  Plaintiff  Naeema James, and hereby files this Response to Wal-Mart's Motion For Protection Order and in Support of Plaintiff's Motion to Compel Discovery and  states as follows:

**I.**
**STATEMENT OF FACTS**

On October 29, 2012  Plaintiff Naeema James and her sister in law, had stopped by the Wal-Mart SuperCenter Store No. 3710 located at 3580 Memorial Drive to shop for thermal underwear for Ms. James sister in law shortly after 3:00 p.m. Ms. James had dropped her sister in law off at the front door while Plaintiff

attempted to find a parking space because her sister in law is disabled and required a motorized cart to shop in the Wal-Mart Store.

The Plaintiff, Naeema James, entered the store and spent some time inside the store trying to locate her sister in law.  Before the Plaintiff could locate her sister in law, Ms. James was approached by a very large man who was dressed in a Crown Royal leather sleeve "Varsity Jacket" whom James

thought was persistently interrupting her and whom she thought was trying to shake her down for money or trying to rob her.

Ms. James was on the Cell phone with her sister in law attempting to determine where he sister in law was located at the time in the store and all the while tried to ignore this man, who was persistent to the point of aggravating her. **EXHIBIT 4**.

Finally, the man reached out and grabbed Ms. James arm, at which time she recoiled and pulled her arm away from this unknown man because she afraid for her safety and quickly left the area where the man tried to grab her.  **EXHIBIT 5.**

Ms. James was still on the phone with her sister in law trying to ascertain where she was located in the store when the same man in the Crown Royal Leather Sleeve Varsity Jacket approached her once again, except this time he had a Wal-Mart employee wearing a Wal-Mart vest with him and accused the Plaintiff of Shoplifting, loud enough for Ms. James Sister in Law to hear the accusation over the telephone during the conversation she was still having with the Plaintiff.

The large man took the Plaintiff to the Loss Prevention Office and stood by the door blocking the Plaintiff's exit from the store. The Plaintiff asked the Loss Prevention Associate to rewind the Surveillance Video which was being displayed on a large monitor on the wall of the Loss Prevention Office and he refused to do so. **EXHIBIT 1**.

What is in dispute in this litigation is what time the Plaintiff entered the store, where she traveled in the store, what she picked up, whether she stuck anything in her purse, whether the Wal-Mart employee accused Plaintiff of shoplifting and whether Plaintiff was touched by the Wal-Mart employee . Of particular interest is why Wal-Mart cannot state what it was that its Loss Prevention Associate, Rashad Byland, did not and could not state or describe what he contends the Plaintiff stole, what was the type of merchandise he says she took, where exactly the merchandise he says was stolen by Defendant was being displayed on the shelf, and the cost of the item he alleges that the Plaintiff stole. See **EXHIBIT 9**; **EXHIBIT 6**, pp. 4-6.

On November 8, 2012, ten days following the incident, Counsel for Plaintiff sent a letter via fax to Henry Green, Store Manger at the Wal-Mart where Plaintiff had been detained and battered and advised Mr. Green that he had been retained to represent Ms. Naeema James in an action against Wal-Mart which occurred at his store on October 29, 2012 when Ms. James was wrongfully detained, battered and libeled by Wal-Mart employees.

Wal-Mart's corporate policy is to retain all video made on store property for thirty (30) days when it is recorded over to use again. See: **Heath v Wal-Mart Stores, Inc., LP**, 697 F. Supp.2d 1373, 1377 (N.D.Ga. 3-11-10).

In that letter, Counsel for Plaintiff  requested  that Surveillance video which was recorded on that date from 3:00 to 4:30 p.m. be preserved and not be destroyed or recorded over for later use in litigation to be  commenced against Wal-Mart. Counsel for Plaintiff also requested that the incident report completed the following day by Ms. James be preserved and a copy provided as the attorney for Naeema James since this is a document which she prepared  and contains statements and information written by my client.

Plaintiff's Counsel also requested the names of the two employees, including the Asset Protection Associate and the female associate involved in this detention as a witness be provided to Plaintiff's Counsel. The letter stated that Ms. James was represented by Counsel and that  an action against was going to be brought against Wal-Mart for the incident which occurred at Mr. Green's store on October 29, 2012 when Ms. James was wrongfully detained, battered and libeled by Wal-Mart employees.

The letter requesting that the surveillance video be preserved is attached as **EXHIBIT 2**. The verification of the transmission and delivery of the letter to Wal-Mart on November 8, 2012 is attached as **EXHIBIT 3**.

Litigation was commenced and in response to the Plaintiff's Request for Documents to Defendants, Wal-Mart produced a surveillance video.  See **EXHIBIT 4.** However, that video only has four sequences of Plaintiff which includes (1) Plaintiff in the Loss Prevention Office (without sound); (2) Plaintiff in the area where the greeter is located showing Defendant's employee grab the Plaintiff's elbow; (3) Plaintiff in the area behind the registers; (4) Plaintiff's sister in law checking out at the registers.

Contrary to the Wal-Mart's contention, the video produced clearly demonstrates that the Loss Prevention Associate grabbed the Plaintiff's arm and she recoiled by rapidly pulling her arm away from the Wal-Mart employee's grasp. See **EXHIBIT 5**.

Contrary to the Plaintiff's specific request to preserve **All** video of the Plaintiff on Defendant's location, Wal-Mart chose to preserve only the video it wanted to use to portray the Plaintiff and destroyed the remainder of the video including video which showed what time the Plaintiff entered the store which would have been captured on the Stanley Camera which is located above each doorway where the Plaintiff would have entered; "Action Alley" which that portion of the store adjacent

to, and including, the area where the fitting rooms are located; and the areas of the store the Plaintiff walked and shopped while in the store. Every Wal-Mart store has more than one video surveillance cameras focused on "Action Alley" as every customer entering the store walks into at least a portion of that area of the store.

It should also be brought to the Court's attention that so exact and precise were the "eyes on" surveillance which the Asset Protection Associate conducted on the Plaintiff when he allegedly saw her "steal" merchandise that he could not even state what it was that the Plaintiff allegedly stole from the Memorial Drive Wal-Mart, describing it only as "Merchandise". The Defendant was asked to describe the item that was taken and the price of the item. The Defendant was also asked to state how the Plaintiff was identified and followed by the Wal-Mart Loss Prevention Associate. None of this information was provided in Wal-Mart's Responses to Interrogatories. **EXHIBIT 6**, pp. 4-6. Even in Wal-Mart's Motion for Protective Order, Defendant is unable to describe the "merchandise" it contends was stolen by Plaintiff as anything more specific as "an item"without a price assigned to the merchandise as requested.

During the discovery portion of the present matter, Plaintiff served a Notice of Inspection of Premises seeking to enter Wal-Mart SuperCenter No. 3710 located at 3580 Memorial Drive, Decatur, Georgia and requested that Wal-Mart provide the following:

1. Locate surveillance cameras and the areas which were videotaped or capable of videotaping on October 12, 2012 including the parking lot and all interior areas;

2. Sample video of those areas which were videotaped or capable of videotaping on October 12, 2012 including the parking lot and all interior areas;

3. Photograph and videotape the Loss Prevention Office monitors and the video capable of being shown on each monitor from every available video camera;

4. All videotape recorded October 12, 2012 between the hours of 3:00 p.m. and 4:30 p.m. as requested in Plaintiff's Counsel's correspondence dated November 8, 2012.

Similar requests were deemed reasonable and were approved recently in the Georgia Court of Appeals decision in ***The Kroger Co. v. Walters***, 735 S.E.2d 99 (Ga. App. Decided 11-29-2012).

In **Walters**, the Plaintiff slipped and fell in a Kroger supermarket on May 25 5, 2008, and landed on his left hip and left elbow. Initially, Walters did not experience pain or other symptoms. Peyton Kelley, the store co-manager, came to the scene, saw the alleged cause of the fall, which he described as "mushy" and smelling like banana, and spoke with Walters and a customer who witnessed the fall. Kelley asked Walters if he was okay, and Walters replied that he appeared to be fine. But Kelley also remembered that Walters said he was a little sore, and Kelley noticed that Walters was limping. Kelley told Walters to let him know if he had any problems so that he could take care of it. Walters gave Kelley his name and resumed shopping; he did not

threaten a lawsuit.

However, when Walters got in his car to go home, he began to experience unusual symptoms, including tingling in his toes, numbness in his legs, and, eventually, loss of balance, which grew worse over time. Neither Walters, nor anyone on his behalf, ever requested that Kroger retain a copy of the videotape surveillance which showed customers shopping in the store on the date of the incident.  Walter never threatened litigation, although two weeks after the incident he told the same store manager on duty at the time of the incident that he was still feeling a little sore from this incident.

Following Kroger's stated procedure to investigate every such incident, Kelley began to investigate Walters' fall that same day. He spoke to store employees including the employee nearest to the fall and he downloaded from a company website a six-page "Customer Incident Report & Investigation Check List," which he completed, partially that day and partially thereafter, based on his notes from the day of the incident, including a diagram of where Walters fell. That diagram is marked as having been drawn on May 25, and every page of the customer incident report, including the diagram, states that it was made "in anticipation of litigation under the direction of legal counsel." The report has instructions to mail it to "Sedgwick CMS, Kroger Liability Unit." Kelley admitted, however, that in several regards, he did not

follow store policy regarding his investigation. Kelley reviewed video from the security cameras located in the vicinity of the fall, including camera 17, the camera closest to that area. The cameras' hard drives retained their video for 17 days but are then erased and reused. In order to retain a video for a longer time, one must transfer the video file from the video hard drive to a CD or DVD.

Kroger store policy dictated that if the video covered the area of the fall, it should be retained. After viewing the video captured at the time of the fall, Kelley decided not to save any video despite the company policy. He testified that none of the cameras captured the incident.

Kelley also testified, however, that he could not recall reviewing the video images that day, that he did not know why he did not make a copy, and that he could not be sure the system was actually working at the time. Kelley admitted that, in addition to the fall itself, the videos might have shown when the store aisles were inspected, how and when banana came to be on the floor in the meat department, and whether any store employees were in the vicinity of the fall. Kelley also testified that if he had looked at the video, he should have recorded his findings in the incident report, yet the report did not reference any video. Finally, Kelley had a still camera at the store, and he testified that he should have taken photographs of the scene but did not do so.      Walter and his wife filed suit less than a year after the fall. At his

deposition on November 30, 2009, Kelley testified that camera 17 — the camera closest to the scene of the fall — had not been moved or re-aimed since the day of the fall. Subsequently, Kroger produced exemplar video (taken from each camera on January 7, 2010), showing each camera's field of view, and camera 17 did not point directly at the place where Walters fell.

Later, on August 3, 2010, Walters' counsel took the Deposition of store manager Harry Turner **in his office at the store**. Turner testified that none of the indoor cameras had been re-aimed, including camera 17, since he began managing the store in 2004 and that the cameras could not be moved electronically, but rather, a person would have to climb a ladder to adjust the camera position. Walters' counsel then asked to view a live feed from camera 17, and Kroger's attorney objected. Following a discussion among the lawyers, the live feed was shown, and it was discovered that the camera was not pointed in the same direction as the exemplar and that, instead, the camera pointed directly at the location of Walters's fall.

The Plaintiff, Walters, filed a Motion for sanctions, and the court held a hearing and entered an Order finding that Kroger had destroyed the video from the date and time of the incident by not preserving it; that the video might have established either actual or constructive knowledge by Kroger of a foreign substance on the floor; that the Customer Incident report stated that it was made in anticipation of litigation; that the exemplar video showed the general area but not the exact

location of the fall; that the subsequent deposition revealed that the camera was "centered on the exact location of Walters' fall and not the location shown in the prior images produced by Kroger and could have clearly shown the exact conditions at the time of Walters' fall and whether Kroger employees knew or should have known of the dangerous condition in that area."

The trial court concluded that Kroger had spoliated the video evidence, which could have been maintained at minimal expense; that the spoliation prejudiced Walters; and that Kroger "acted in bad faith in failing to preserve the evidence and manipulating evidence to excuse its actions." At the same time, and based on its ruling on spoliation, the trial court denied Kroger's pending motion for summary judgment on the merits.

During discovery, the trial court struck Kroger's Answer on the grounds that Kroger had spoliated evidence and acted in bad faith, thereby precluding Kroger from introducing evidence at trial to contest its negligence. The case went to trial on causation, damages, and attorney fees. Walters, age 48 at the time of the fall, was able to show the fall caused a severe spine injury that required surgery and resulted in a lifelong disability. A jury awarded $1,689,456 in damages and $675,782.40 in attorney fees.

In the present matter, as in **Walters**, Plaintiff seeks to inspect the video

surveillance system to ascertain what images could have been captured of Naeema James which were not.  Here, as in **Walters**, the only way to determine whether images could have been captured of the Plaintiff in the Defendant's store, including what time the Plaintiff entered the store; what time the Plaintiff exited the store;  as well as what areas in the store the Plaintiff traveled on said date of the incident; and whether the area where the Loss Prevention Associate said he witnessed the Plaintiff allegedly shoplifting was captured, or could have been captured on the date of the incident.

Defendant Wal-Mart states in its present Motion that it has proposed a less intrusive means of providing Plaintiff with the information she sought. Specifically, the  Defendant offered to produce "still shots" from other cameras located around the areas of the alleged incident after the inspection. Defendant also states that it offered to make an  employee available for a deposition concerning the "still shots" produced in order to provide any "authentication" testimony for the "still shots" from the subject store.

The problem with Defendant Wal-Mart's proposal is that it relies entirely on the Defendant's discretion as to what it "decides" and "chooses" to capture as still shots and, one step further, what it decides in its sole discretion  was an area where

it recalls that the Defendant was shopping or traveling in its store and then, finally, which of all these still shots it will produce in its discretion.

It is this discretion that Wal-Mart wants to exercise now is what caused there to be an issue here in the first place.

The entire issue which has now arisen in Wal-Mart's Motion For Protective Order would have been unnecessary had Wal-Mart complied with Plaintiff's request in the letter faxed to Wal-Mart's Manager a week after this incident when it requested Wal-Mart to preserve "Surveillance Video which was recorded on that date from 3:00 to 4:30 be preserved and not be destroyed or recorded over for later use in litigation to be commenced against Wal-Mart." **EXHIBIT 1, EXHIBIT 2.**

Wal-Mart could have easily complied with this exact request in that the time period in question was very brief and concise. At a minimum, Wal-Mart could have elected to preserve all the images of the Plaintiff outside and inside the store from the time of her arrival until her time of her departure. Wal-Mart did neither.

As has been the case in other litigation Wal-Mart is involved in around the country, this litigant chooses to play by its own rules and dictates and inevitably make a conscious decision to preserve only video which it wants for its own use, regardless of the specific, timely, written, requests from Plaintiff's Counsel .

In the present case, not only was the Plaintiff's requests in **EXHIBIT 2** timely

enough to allow Wal-Mart to capture the video, but that correspondence also included language which advised Wal-Mart that litigation was certain to be commenced by Naeema James. See e.g. **Wal-Mart Stores v. Lee**, 290 Ga. App. 541 (2008). Under these circumstances, Wal-Mart cannot claim that it had no reason not to preserve ALL of the video that the Plaintiff requested.        Instead, Wal-Mart has chosen selective images of the Plaintiff in the store, but certainly did not preserve all images of Plaintiff in the store, as dictated in the November 8th correspondence.  There are certainly many other images which Plaintiff and her Counsel are certain exist of her in the store which Wal-Mart now says were not preserved. It is those images of Plaintiff which showed where she was traveling in the store which could very easily prove she was not in the area where she is alleged to have to have stolen merchandise, and if in the area where she is alleged to have stolen merchandise, then the video of her in that area may show she put nothing in her purse. However, Wal-Mart refuses to provide this video, notwithstanding the fact that this exact video was requested to be preserved.

## II.

## ARGUMENT AND CITATION OF AUTHORITY

Wal-Mart argues that a request for inspection under Federal Rule of Civil Procedure 34(a)(2) is subject to the limits of Rule 26(b)(2)(c), which provides in part

that the Court must limit the discovery of otherwise discoverable information when "the burden or expense of the proposed discovery outweighs its likely benefit." Rule 26(c) of the Federal Rules of Civil Procedure provides that the Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, undue burden, or expense.

Wal-Mart argues that the requisite "good cause" for a protective order exists in this case in relation to Plaintiff's Notice of Inspection of the premises. Plaintiff has asked for virtually unfettered access to Wal-Mart and Wal-Mart's Asset Protection office at the subject store.  Nothing could be further from the truth.

Wal-Mart wants to replay that portion of the facts that were present in **Walters** where Defendant Kroger provided still shots showing the camera view from the area located near where the incident occurred in order to pacify the Plaintiff's request for surveillance video.  In **Walters**, Kroger was asked to show a "live feed" of the meat department camera (which is the area where the fall involving Walters occurred) during the store managers deposition which was being taken in his office while he was being deposed.   The camera  in question was known as "Camera 17".  Apparently, the video monitors and recording equipment was also located in that office.   Kroger objected to showing the "live feed" of Camera 17 during the deposition and a  question arose during the deposition about what the surveillance

camera actually captured that day after it had been "confirmed" that the cameras had not been repositioned or moved since the incident and that the "still shots" did not capture the area of the Plaintiff's fall. After much discussion, the decision was made to show the "live feed" of Camera 17 upon which the feed from that camera clearly showed that those images depicted on the still shots were different from what was being displayed on the monitor during the deposition and that Camera 17 clearly depicted the exact area of the store in the meat department where the Plaintiff had fallen.

Were it not for Plaintiff's Counsel insistence on watching the live feed of Camera 17 during the deposition of the store manager in **Walters**, the fact that this same camera actually would have captured the incident involving the Plaintiff's fall in the meat department would have never been discovered.

If Wal-Mart were entrusted to provide still camera shots in lieu of allowing Plaintiff's Counsel to inspect the cameras views at the Loss Prevention Office, then the same thing that occurred in the present matter when Plaintiff's Counsel asked for all video surveillance between 3:00 p.m. and 4:30 p.m. on October 29, 2012 only a few days after the incident on October 29, 2012, then the same result will be repeated in that Wal-Mart will produce only what it wants Plaintiff's Counsel to see and video which would accurately demonstrates what areas were being videotaped by

surveillance cameras will never be disclosed to Plaintiff.  Such conduct by Wal-Mart has already been demonstrated in this matter and there is no reason to believe that its handling of the pending Motion For Inspection would be treated any differently.

The inspection proposed by Plaintiff is not at all intrusive, nor is it burdensome.  Given Wal-Mart's conduct thus far in this specific litigation, it cannot be entrusted to provide truthful, honest or untainted discovery results. It should be noted Wal-Mart has a very long, notorious and well-documented history of engaging in dubious, questionable  conduct, specifically during litigation around the United States, especially in the destruction of evidence,  spoliation and lost evidence. See e.g. **Iliadis v. Wal-Mart Stores, Inc.**, 191 N.J. 88,922 A.2d 710 (2007), **Greenwalt v. Wal-Mart Stores, Inc.**, 253 Neb. 32, 567  N.W.2d 560 (1997) [$15,000 sanction when federal judge found that Wal-Mart had destroyed photographs]; **New v. Wal-Mart Stores, Inc.**, 96-8-10571 (Tex. Dist. Ct. Jackson Co.). [$104,102 discovery sanction; **Johnson v. Wal-Mart Stores, Inc.**, 217 F. Supp.2d 762 (E.D.Tex. 2002); **Gribben v. Wal-Mart Stores**, **Inc.**, 824 N.E.2d 349 (Ind. 2005); **Martino v. Wal-Mart Stores, Inc.**, 835 So.2d 1251, 908 So.2d  (Fla. App. 4 Dist. 2003); **English v. Walmart**, 2011 WL 3496092 (Dist. Nev. Aug. 10, 2011);  **Wal-Mart Stores v. Lee**, 290 Ga. App. 541 (2008); **Hatfield v. Wal-Mart Stores, Inc.**,335 Fed. Appx. 796, 804 (10th Cir. 2009); **Walmart v. Middleton**, 982 S.W.2d 468, 470 (Tex.App.- San

Antonio 1998);  **Wal-Mart  Stores v.  Johnson**,  (Tex. App.- Dallas 2000); **Davis v**

**Wal-Mart Stores** , 93 Ohio St.3d 488 (Ohio Sup. Ct. 2001); **McLeod v. Wal-Mart**,

Case  No. No. 12-13919 (11th Circuit - Decided 4/3/13); **Rivera v. Wal-Mart**, (8-19-

2010); **Demetrulias  v. Wal-Mart Stores**, Case No. CV-11-01407 (Dist.  Ariz.

Decided 1-10-2013); **Basco v. Wal-Mart Stores, Inc.,**216 F. Supp.2d 592 (E.D.La.

2002), **Cutler v. Wal-Mart Stores**, **Inc.**, 175 Md. App. 177, 927 A.2d 1 (2007),

**Petty v.Wal-Mart Stores, Inc.**, 148 Ohio App.3d 348, 773 N.E.2d 576 (2002),

**Harrison v. Wal-Mart Stores, Inc.,**170 N.C. App. 545, 613 S.E.2d 322 (2005);

**Wal-Mart Stores, Inc. v.  Lopez**, 93 S.W.3d 548, 557 (Tex.App. 2002); **Braun v.**

**Wal-Mart Stores, Inc.**, 24 A.3d 875 (Pa. Sup. Ct. 2011); **Rivera  v. Wal-Mart**, Slip

Op. 32447(U) (N.Y. Sup. Ct., 8-19-2010); **Meissner v. Wal-Mart Stores, Inc.,** Case

No. A-159432 (Tex. Dist. Ct. Jefferson Co. Apr. 1999); **Woska v. Wal-Mart Stores,**

**Inc.**, No. 953998 (Fl. Cir. Ct. Orange Co. Jan 1998); **Wal-Mart Stores, Inc.  v.**

**Davis**, 979 S.W.2d 30 (Tex.App. 1998), [$120,000 sanction against Wal-Mart for

repeated discovery violations]; **Shafer v. Wal-Mart Stores, Inc.,**, 176 F.3d 484 (9th

Cir. 1999); **Lynch v. Wal-Mart Stores, Inc**. (Tex. Dist. Ct. Gregg Co. Aug. 1996)

[$5,000 sanctions for Wal-Mart discovery abuses]; **Empire, Inc. v. Wal-Mart**

**Stores**, Inc., 188 F.R.D. 478, 481-82 (E.D.Ky. 1999); **Jane Doe v. Wal-Mart Stores,**

**Inc.** 479 S.E.2d 610 (W.Va. 1996).

In **Jane Doe v. Wal-Mart**, *Supra*, so egregious was the conduct of Wal-Mart in hiding evidence in that case that Justice Larry Starcher  authored a special concurrence stating :

**"I concur with the majority's decision to reverse the judgment below, and to remand this case for a new trial. I write separately to emphasize that when a large corporate defendant such as Wal-Mart, an institution with significant power and financial resources, uses obstructive tactics to make litigation difficult for injured victims and their attorneys, a circuit court must deal with these tactics head-on and use its power to level the playing field."** (See **EXHIBIT 7**).

Similarly, in **Wilson v. Wal-Mart Stores, Inc.**, 199 F.R.D. 207 (S.D. Tex. 2001). U.S. District Court Judge stated in his Order concerning sanctions against Wal-Mart in that case, "**Unfortunately, nefarious conduct is all too common in lawsuits in which Wal- Mart is a party**."

The Defendant argues in its Motion that the "search for truth" must be balanced against the burdens or dangers created by the inspection since in this case, the inspection of Wal-Mart's Loss Prevention office, would be "highly disruptive" to Wal-Mart, constitute a **"danger"** to Wal-Mart and have the potential of harming innocent third parties.  It is ironic that Wal-Mart concedes, however unintentional, in that statement that it is obvious the party seeking the truth is Plaintiff.  Additionally, Defendant in this case offer no explanation of how such inspection of the Loss Prevention Office would be "highly disruptive"  or "harm innocent third parties".

In fact, Wal-Mart fails to ever identify those individuals who are considered "third parties" or what harm could possibly come to these yet to be identified individuals by Plaintiff's inspection of the video monitoring system. Similarly, Wal-Mart fails to identify how Plaintiff's inspection of the asset protection office would result in a burden, a danger, and bring harm to Wal-Mart itself.

Additionally, Wal-Mart's argument that the Loss Prevention Office "has nothing to do with this lawsuit" is patently false. The Plaintiff specifically asked Wal-Mart how Naeema James was observed shoplifting and Wal-Mart twice refused to answer this question in its Interrogatory Responses and Supplemental Responses to Interrogatories. This would suggest that the discovery of what the Loss Prevention Associate construed to be shoplifting was seen on the surveillance video. Wal-Mart has not suggested anything to the contrary. The Loss Prevention Office is where the video surveillance system is located.

Similarly, Wal-Mart argues that the Loss Prevention Office (i.e. the surveillance operation control room) is not only "off limits" for members of the general public, but also for Wal-Mart employees not directly involved in asset protection. Again, nothing could be further from the truth. As the frame capture from the surveillance video of Naeema James demonstrates, Ms. James herself, who is not a member of Wal-Mart's Asset Protection team, but is a member of the general

public, was taken to this same "high security/top secret" Loss Prevention Office for questioning about this incident.

In fact, while Ms. James was in the Loss Prevention Office for questioning, the large LCD monitor, which is clearly depicted in **EXHIBIT 1,** was re-playing video of Naeema James shopping in the store earlier that day. Ms. James asked the Loss Prevention Associate to rewind the video to show her as she entered the store until that time when she was detained by the Loss Prevention Associate and he refused to do so. Also present in the video capture is Wal-Mart Employee Trina Moreland who is merely a Customer Service Manager (CSM) for Wal-Mart, is not in any way connected with Loss Prevention and except for being a female employee who was required to be present during the questioning of any female customers, has absolutely nothing to do with the incident in question. Therefore, Defendant Wal-Mart's statement that it "works hard to maintain the privacy and confidentiality of its asset protection office" is blatantly false and any argument in support of this proposition is spurious.

Here, as in **<u>Walters</u>**, the Plaintiff's request for an inspection of the surveillance operation control room is most emphatically designed and calculated to lead to the discovery of admissible evidence. In **<u>Walters</u>**, but for the insistence of Plaintiff's Counsel to view the live feed during the deposition of the Store Manager in the same

room where video surveillance was operated and viewable, the Plaintiff would not have discovered the fact that Kroger had been deceptive in changing the camera angle of surveillance Camera 17 for the "still shot" near the meat department to a repositioning of Camera 17 so that the area where the Plaintiff's fall occurred was not visible from the repositioned Camera 17.

Here, Wal-Mart has absolutely failed to show how the denial of Defendant's motion for protective order would result in the potential compromise of confidential proprietary practices and information of Wal-Mart. The Plaintiff herself will not be present during the inspection of the video surveillance system.  Plaintiff's Counsel has previously signed a Confidential Agreement and an Order on same was entered on March 20, 2013. [**DOC 14**].  Such an Agreement states in explicit detail how confidential and sensitive materials are to be disseminated and protected solely for the unilateral benefit of Wal-Mart. There is no bi-lateral application of this Order.

Wal-Mart's reliance on **Salsbury Labs, Inc. v. Merieux Labs, Inc.**, 908 F.2d 706, 710 (11th Cir. 1990), is misplaced and preposterous in that this decision and the case it cites pertain only to trade secrets involved in the manufacturing process. In fact, **Salsbury Labs** is about a case where one pharmaceutical manufacturer sued another over use of proprietary manufacturing of a "chicken vaccine".  Each subsequent decision citing **Salsbury** are strictly limited to trade secrets involving

manufacturing industries with the exception of the decisions in **Square Intern v BBDO Atlanta**, 455 F. Supp.2d 1347 (N.D. 2006) and **Capital Asset Research Corp. v. Finnegan**, 160 F.3d 683 (11th Cir. 1998) both of which involved unsuccessful attempts to use this argument similar to the manner where Wal-Mart has chosen to argue **Salsbury** herein. The Georgia Courts have strictly limited the ruling in **Salsbury** to those cases involving manufacturing and medical research.

Defendant's expressed "great deal of concern in connection with granting such access to Plaintiff and her counsel" are improperly placed. There will be no dissemination of smart phone photographs or video of the asset protection room, or information concerning its configuration or contents because a signed Confidentiality Order is already in place. The Order has been signed by both parties and signed by the Court. [**DOC 14**]. Wal-Mart has already provided Plaintiff with video of the Asset Protection Office in this case as well as video surveillance of the Plaintiff in this matter, so their "great deal of concern" is overblown and disproportionate to any real or perceived threat.  Similarly a search on the internet for images of Walmart Asset Protection and Wal-Mart Loss Prevention already produces a large assortment images which are no different from images previously produced in this matter. Neither the images already produced and those photographs already populating the internet reveal nothing earth shattering or which could be used to defeat the security system which

Wal-Mart already has in place, which it has had in place for more than two decades, and which is identical to the surveillance system in place in virtually every "big box" retailer in business in the U.S.  including, but not limited to, Home Depot, Target, Lowes, Sears, Toys R Us, Marshalls, Steinmart, K Mart, Kohl's, Fry's, FYE, Macy's, HH Gregg, Best Buy, Sam's, Costco, BJ's, Office Depot, Office Max, Staples, Baby Superstore, Burlington Coat Factory, PetSmart, Ikea, Cabela's, Barnes & Noble, Dick's, Bass Pro Shops, Hobby Lobby, Michaels, J.C. Penney's, Old Navy Stores, Petco, Pier One, Sports Authority, TJ Maxx, and many more.

Contrary to Wal-Mart's argument, nothing which the Plaintiff or her Counsel could possibly do during this inspection would deprive Wal-Mart of the competitive advantage it enjoys over its competitors in the important realm of asset protection.

With respect to Wal-Mart's argument that the reference to the October 12th day is irrelevant, Plaintiff Agrees.  That date was incorrectly entered as the loss date and the Notice should have referred to the October 29, 2012 date when this incident actually occurred. To that extent, Plaintiff and Defendant agree that the October 12, 2012 date referenced in the Notice of Inspection should read October 29, 2012.

Additionally, in order to better streamline this process, Counsel for Plaintiff has conferred with his client about the areas of the store where Plaintiff recalls traveling on the afternoon of the incident and is willing to diagram on a floor plan the areas

where she traveled so that Defendant can better identify the cameras which would have captured the areas where camera views are desired and were capable of capturing Plaintiff as she walked through the Wal-Mart Store on Memorial Drive.

With Defendant's continued insistence on using "still shots" it chooses and unilaterally decides are relevant, from cameras in the area of the incident, as for the reasons discussed in the discussion of the **Walters v. Kroger** decision, that option is fraught with opportunities for manipulation by Wal-Mart. If the potential for problems and abuse came to fruition in Walters, there is no reason to believe the same result will not occur here.

It is interesting to note that of the hundreds of appellate and trial level Court decisions involving Wal-Mart, some of which are referenced previously, not a single Opinion from any state or federal trial court or appellate court has approved the limited procedures and product  suggested by Wal-Mart in its present Motion.

The most comparable case similar to the facts here are those in **Walters**, which eventually resulted in the Plaintiff having access to the live video feed from the surveillance cameras in the area where the Plaintiff fell while a deposition took place at the store and in the room where the video equipment was available and accessed by the Store Manager during his deposition by Plaintiff's Counsel.

Truth, always being the desired and preferred outcome of any discovery, was obtained by the Plaintiff in Walter's, notwithstanding the efforts to conceal same, including the use of "still shots" from the video camera which had obviously been manipulated by Kroger to obtain the desired result for Kroger in that case.  There isw no reason to believe the same thing Kroger attempted would not happen in the present case given concession to Wal-Mart's wishes in this litigation.

Wal-Mart is not vigorously resisting Plaintiff's inspection request in the present matter except for the sole purpose of  obtaining the best result possible for Wal-Mart herein.  The arguments presented and options it wants to provide in lieu of Plaintiff's requests are nothing but diversions and efforts to prevent Plaintiff from obtaining the video which was available to be preserved on the date of the incident involving James, but was not preserved despite very specific instructions within a few days after the incident which Wal-Mart chose to deliberately ignore.

**C. Defendant's objection to Plaintiff's request for additional video**

Finally, Defendant objects to Plaintiff's Request  Number 4 in the Notice, which seeks to allow Plaintiff to "[r]eview all videotape recorded October [29], 2012 between the hours of 3:00 p.m. and 4:30 p.m. as requested in Plaintiff's Counsel's correspondence dated November 8 2012."

Unless the Defendant actually preserved this video and still has the 1 ½ hours of video from the entire store between the hours of 3:00 and 4:30 on the date of this loss in its possession, then its argument is moot at this point.

Wal-Mart has consistently represented to the Plaintiff in its discovery responses and argued herein that it has already provided about "5 minutes" of video which contains **all of the images** of the Plaintiff in its possession.

**"Wal-Mart has already produced five video clips as described above. These videos are the only videos of the incident that were preserved. "**

However, Wal-Mart's representation is disingenuous in that what this statement does not disclose or provide is what Plaintiff so desperately desires. Plaintiff desires all images of Plaintiff in the Wal-Mart store from 3:00 to 4:30 p.m. for the October 29, 2012 date. It does not seek only video from the "incident" which took place between Plaintiff and Wal-Mart personnel. Wal-Mart has used every euphemism and phrase to avoid admitting that video of Plaintiff in its store exists besides the apprehension and questioning of Plaintiff and that this has been preserved. The Plaintiff knows that for Wal-Mart to admit the contrary and to confirm that the video of Plaintiff strolling in the store besides in those areas already produced would most certainly result in a Motion for Spoliation against Wal-Mart.

Wal-Mart has used clever phrases and aversion to keep from admitting that it possesses video of the Plaintiff shown "not shoplifting" would be tantamount to defeat by Wal-Mart in this matter.

Wal-Mart would rather have its Loss Prevention Associate vaguely testify that he saw the Plaintiff "pick up an object" or that she "concealed merchandise" without stating specifically what it was that Plaintiff had allegedly pilfered or secreted rather that to state the price or specifically identify the merchandise, which the Loss Prevention Associate easily could have done since he had the luxury of going back to the location where he saw the Plaintiff supposedly 'steal' the merchandise after the fact and record the item, price and description following the apprehension and detention of the Plaintiff. Had the Loss Prevention Associate actually witnessed this theft as has been represented, then inspection of the Plaintiff's handbag would not have even been necessary.  Notwithstanding the fact that Plaintiff asked Wal-Mart to specifically describe the merchandise which it alleges was stolen by Plaintiff in its Responses to Plaintiff's Interrogatories **this was never done in this matter. EXHIBIT 6,** pp. 4-6.

For the reasons stated, Plaintiff seeks a ruling that Defendant's Motion for Protective Order be denied.

Submitted this 26th day of May, 2013

WILLIAM P. CLAXTON
Georgia Bar No. 129320
Counsel for Plaintiff

180 Interstate North Parkway
Suite 115
Atlanta, GA 30339-2102
(770) 933-1946

## <u>CERTIFICATE OF SERVICE</u>

This is certify that I have this day served a copy of the within and foregoing

**PLAINTIFF'S RESPONSE TO WAL-MART'S MOTION FOR PROTECTIVE**

**ORDER AND PLAINTIFF'S MOTION TO COMPEL DISCOVERY** upon all

parties to this matter by ECF/CM electronic filing addressed to counsel of record

This 26th  day of May,  2013

## **CERTIFICATE OF FONT**

This is to certify that the within and foregoing pleading has been prepared using Times New Roman font, 14 point, which is approved by the Court in Local Rule 5.1B.